IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

NASSIR CAUTHON,

    Petitioner,

    v.

WARDEN, MARION
CORRECTIONAL INSTITUTION,

    Respondent.

Case No. 2:17-cv-272
JUDGE GEORGE C. SMITH
Magistrate Judge King

## OPINION AND ORDER

Petitioner, a state prisoner, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on Petitioner's *Motion for Stay of Proceedings* (Doc. 16) and on Petitioner's *Motion(s) for Production of Trial Transcripts* (Docs. 17, 21). For the following reasons, these motions are **DENIED.** Petitioner may have 21 days in which to file a traverse to the Return of Writ (Doc. 14). *See Order* (Doc. 19).

**Facts and Procedural History**

Petitioner challenges his June 2006 convictions, following a jury trial in the Franklin County Court of Common Pleas, on charges of rape and gross sexual imposition. The Ohio Court of Appeals for the Tenth District summarized the facts and procedural history of the case as follows:

> Defendant-appellant, N.D.C.,[1] appeals from the judgment of the Franklin County Court of Common Pleas reinstating the judgment of conviction following a remand from this court.
>
> On June 17, 2005, appellant was indicted on four counts of rape, in violation of R.C. 2907.02, and one count of gross sexual

---

[1] Initials were used throughout the court's opinion, "[f]or purposes of anonymity. . . ." *State of Ohio v. [N.D.C.]*, 2008 –Ohio- 6120, 2008 WL 5049761, *6, (Ohio App. 10th Dist. Nov. 25, 2008).

imposition, in violation of R.C. 2907.05. A jury trial began on June 15, 2006. The jury returned verdicts finding appellant guilty of three counts of rape and one count of gross sexual imposition. Subsequent motions for acquittal and a new trial were denied by the trial court. By judgment entry filed July 3, 2006, the trial court imposed consecutive life sentences for the rape convictions and a five-year consecutive sentence for the gross sexual imposition conviction. Appellant timely appealed to this court and asserted a single assignment of error. *State v. N.D.C., Franklin App.* No. 06AP–790, 2007–Ohio–5088 ("*N.D.C. I*").

The underlying facts of the convictions were set forth in *N.D.C. I*, as follows:

In April 2005, "DR," then age 12, resided with his mother (hereafter "DR's mother") and his two younger stepbrothers, "DC," age seven, and "NC," age eight, in Columbus, Ohio. Appellant is the father of DC and NC, and the stepfather of DR; appellant began dating DR's mother when DR was three years of age.

On April 1, 2005, appellant moved back to DR's mother's residence after being away for a period of time. The state's theory of the case was that appellant sexually assaulted DR on three separate occasions, over an approximate two-week period in early April 2005, while DR's mother was at work. DR testified that two of the incidents occurred when he was cleaning the bathroom; specifically, on both occasions, appellant entered the bathroom, pulled down DR's pants, and inserted his finger inside DR's anus. DR related a third incident in which appellant told him to go to his mother's bedroom, take off his clothes, and lie on the bed. DR testified that, as he was lying face down on the bed, appellant got on top of him and "put his penis inside my butt." (Tr. Vol. II, at 266.)

DR's younger brothers both testified regarding the alleged incident in the bedroom. Specifically, DR's brother, NC, testified that he observed his "dad on top of my brother" while looking through a vent located in his bedroom. (Tr. Vol. III, at 445.) DR's other brother, DC, testified that he looked through his mother's bedroom door and observed his father on top of DR on the bed. According to DC, his father "[p]ut his private part in my brother's behind." (Tr. Vol. III, at 478.) Appellant noticed DC standing near the bedroom door, and he grabbed a belt and struck DC on the legs.

Sha Clark is a medical social worker at Children's Hospital. On May 23, 2005, Clark conducted an interview with DR at Children's

Hospital. During the interview, DR indicated that, on several occasions, he had been a victim of sexual abuse by appellant. DR related that appellant had touched his private parts, and he described different incidents occurring in the bathroom and one incident that occurred in the bedroom.

Dr. Ellen McManus, an emergency medical physician at Children's Hospital, conducted a physical examination of DR on May 23, 2005. The physician noted nothing abnormal during the examination.

In April 2005, DR's mother was employed and worked first shift hours. Approximately two weeks after appellant had moved back to her residence, DR's mother noticed some marks on DC's legs. She asked NC about the marks on DC's legs, and NC told her appellant "had whooped him for getting in trouble at school." (Tr. Vol. III, at 528.) Appellant moved out of the house on April 15, 2005, and, on May 16, 2005, DR's mother learned of the alleged incident involving appellant and DR. She phoned the police, and subsequently took the boys to Children's Hospital.

On cross-examination, DR's mother acknowledged that she had concerns about appellant's sexuality, fearing he might do something sexually inappropriate to her children. When she asked DR whether any inappropriate activity had occurred, he repeatedly told her nothing had happened.

The first witness for the defense was an uncle of DR's (hereafter "DR's uncle"). In the spring of 2005, DR's uncle had a conversation with DR about alleged sexual contact, and DR denied having any such contact with appellant. DR's uncle testified that DR told him about threats his mother made to him (DR).

Kathleen Cooke is a private investigator who investigated the allegations at the request of defense counsel. As part of the investigation, Cooke interviewed DR's mother, who informed Cooke that she started a new job on April 7, 2005.

On May 17, 2005, Columbus Police Officer Wendell J. Tolber responded to a 911 call at an address on Maryland Avenue. According to Officer Tolber's report, the mother of an alleged victim (DR) told the officer that her husband had molested the victim, and that the "[v]ictim stated the incident occurred the end part of 2004." (Tr. Vol. IV, at 612.) A domestic violence detective was contacted and advised of the incident, but the detective

indicated he would not be responding due to the span of time involved.

At trial, the parties entered into a stipulation that Franklin County Children Services caseworker Robin Glove, if called to testify, would state that she interviewed DR on May 6, 2005. During that interview, DR denied any touching or sexual contact by his stepfather. Further, DR did not make eye contact with the caseworker during the interview, and had his back to her while he was talking.

*Id*. at ¶ 3–13.

In *N.D.C. I*, appellant raised one assignment of error, which essentially alleged the trial court's interpretation of Ohio's rape shield law precluded him from offering a defense that there was an alternative explanation for the conduct alleged. Specifically, appellant argued the alleged victim, DR, was involved in several instances of digital anal sexual activity prior to the alleged conduct in the instant case. In support, appellant pointed to two 2003 reports from Children Services stating that "DR 'put his finger up DC's butt'" and that DR's cousin committed anal penetration against DR and another relative. *Id*. at ¶ 16.

After review, this court concluded the trial court's blanket exclusion of the evidence at issue, solely on the basis that such evidence did not fit within one of the exceptions under the rape shield statute, was error. This court held, based on *State v. Gardner* (1979), 59 Ohio St.2d 14, 391 N.E.2d 337, the trial court was required to balance the state's interest which the statute is designed to protect against the probative value of the excluded evidence, and that appellant was entitled to have the trial court assess whether the evidence was relevant to the theory presented, and, thus, constituted a material fact, and whether application of the rape shield statute was unconstitutional as applied to the facts. This court then stated:

> While we conclude that the trial court erred in not engaging in the requisite balancing under *Gardner*, we decline to reverse for a new trial at this time. Rather, in light of the record on appeal, we remand this matter for the trial court to conduct a hearing and, in the first instance, engage in the appropriate balancing analysis to determine whether appellant's constitutional right to confrontation requires that evidence as to prior alleged sexual activity should

> have been admitted, even assuming it would otherwise be excluded by the rape shield statute. If, upon remand, the trial court determines that appellant's right to confrontation outweighs the state's interest in excluding this evidence, and that the probative value of the evidence at issue outweighs its prejudicial effect with respect to a material fact at issue, the trial court is instructed to vacate appellant's conviction and grant a new trial. Otherwise, the trial court shall reinstate the judgments of conviction. *See, e.g., State v. Boggs* (1992), 63 Ohio St.3d 418, 424, 588 N.E.2d 813 (following defendant's trial and conviction, matter remanded to trial court to conduct *in camera* hearing to determine, in first instance, whether evidence proffered by defense was properly excluded as involving activity protected by rape shield statute).

*Id*. at ¶ 36, 391 N.E.2d 337.

Upon remand from this court, the trial court conducted a hearing on December 21, 2007. Neither party offered new evidence, but both parties presented arguments based on relevant case law and the evidence admitted and/or offered at trial. After the hearing, the trial court rendered a decision on February 19, 2008, stating, in part:

> * * * The FCCS March 5, 2003, report would be relevant and probative if the allegations were substantiated. However, this incident was investigated and all involved denied the behavior. The probative value of this unsubstantiated report is nil. Most certainly there is no clear proof that the allegations in the March 5, 2003, FCCS report actually occurred. When weighted against the State's interest protected by the Rape Shield Law, the State's interest prevails.
>
> * * *
>
> * * * The FCCS March 17, 2003, report concerning DR's cousin committing anal penetration of DR is probative and relevant. * * *

The evidentiary value of the FCCS report must be considered in light of the eyewitness testimony of these three children. * * * When this diminished evidentiary value is compared to the State's interest protected by the Rape Shield Statute, the State's interest prevails.

* * *

With all due respect to the appellate court, the child victim's testimony concerning the sexual conduct itself was not very detailed. This is common with child sexual assault victims. DR's testimony was, however, detailed concerning the events surrounding the assaults, *i.e.*, events leading up to and following, locations, witnesses to the bedroom assault and what happened to the witnesses after the fact. Having seen and heard the trial it is apparent to this Court that the "details" referenced in Clark's testimony and the prosecution argument were not sexual conduct detail but rather situational detail. When viewed in this light, the evidence of alleged prior sexual experiences of the child victim is much less important to the defendant's case. The defendant presented a vigorous defense. DR's mother, DR's uncle, and through stipulation, Robin Glove of FCCS all testified that DR denied any sexual contact by his stepfather. Dr. Ellen McManus noted nothing abnormal during the physical examination of DR. DR's mother admitted that DR's brother, NC, told her originally that appellant "had whooped him for getting in trouble at school." (Tr. Vol. III, at 528.) Defense counsel thoroughly cross examined DR's mother on matters of bias and prejudice toward the defendant and coaching of the child witnesses. It is simply untrue that the defendant was left defenseless without the evidence of DR's alleged prior sexual experience.

Accordingly, when this Court balances the State's interest which the Rape Shield Statute is designed to protect against the probative value of the excluded evidence, the State's interest prevails.

The judgment of conviction is reinstated.

> It is from this judgment appellant appeals and brings the following two assignments of error for our review:
>
> First Assignment of Error:
>
> Mr. Cauthon was denied the right to confront and cross-examine witnesses, a fair trial, and due process of law, in violation of the fifth, sixth and fourteenth amendments to the U.S. Constitution and Article I, §§ 10 and 16 of the Ohio Constitution, when the court improperly limited cross-examination to preclude evidence of prior sexual misconduct by the victim relevant to support the defense theory of the case.
>
> Second assignment of Error:
>
> Mr. Cauthon was denied due process of law, in violation of the fifth, sixth and fourteenth amendments to the U.S. Constitution and Article I, §§ 10 and 16 of the Ohio Constitution, when the indictment failed to allege a culpable mental state.

*State v. N.D.C.*, No. 08AP-217, 2008 WL 5049761, at *1-4 (Ohio App. 10th Dist. Nov. 25, 2008). On November 25, 2008, the appellate court affirmed the judgment of the trial court. *Id.* Petitioner did not timely appeal; however, on March 4, 2009, the Ohio Supreme Court granted Petitioner's motion for a delayed appeal. *State v. N.D.C.*, 121 Ohio St.3d 1406 (2009). On July 1, 2009, the Ohio Supreme Court declined to accept jurisdiction of the appeal. *State v. N.D.C.* 1454 (Ohio 2009).

Petitioner pursued additional state collateral action.

> Defendant filed [a] motion for leave to file a delayed motion for new trial on December 5, 2014, asserting that he had recently discovered that the alleged victim stated "under oath, that he testified untruthfully at trial and the offenses of conviction did not occur." (Motion for Leave, 1.) Defendant asserted that, although D.R. admitted that he "came forward a couple of months after the trial and stated he was not sexually abused by [defendant]," no one "did anything with [D.R.'s] recantation until it came to the attention of Defendant in the past 2 years." (Motion for Leave, 6.) Defendant noted that D.R., D.C., and N.C. first met with defendant's current counsel on August 2, 2013, and that the boys signed affidavits memorializing their recantations on November

7

21, 2014. Defendant accordingly asserted that the evidence "presented in these affidavits was not available at the time of trial and could not have been reasonably discovered through the exercise of due diligence," as "[o]ne can not force people to tell the truth." (Motion for Leave, 7.)

In their November 21, 2014 affidavits, D.R., D.C., and N.C. all stated that they had recanted their trial testimony shortly after the trial. D.R. averred that, "[w]ithin a couple of months after the trial" he "again told the truth that [he] was not sexually abused by [defendant]." (D.R. Affidavit, ¶ 10.) D.R. explained that, when he initially denied being sexually abused by defendant, his mother "whipped [him] with a belt and with her hands * * * she punched [him] in [his] face and she demanded that [he] tell the truth. This meant that [he] was coached by her to lie about [his] stepfather." (D.R. Affidavit, ¶ 6.) D.R. explained that he "felt a huge amount of pressure from [his] mom and [he] finally gave in and said what she wanted [him] to say." (D.R .Affidavit, ¶ 7.) D.R. stated that, for as long as he could remember, his mother had "falsely accused people of sex abuse." (D.R. Affidavit, ¶ 9.) D.R. averred that defendant was "in prison for something he did not do." (D.R. Affidavit, ¶ 11.) N.C. stated that he "told [his] mom 1 month after trial that [his] dad [was] innocent." (N.C. Affidavit, ¶ 9.) D.C. averred that "[f]or years [he][has] been telling others that [his] father never molested [his] brother." (D.C. Affidavit, ¶ 9.) N.C.'s and D.C.'s affidavits corroborated D.R.'s statements regarding their mother's influence on their testimonies.

The state filed a memorandum *contra* to the motion for leave on December 11, 2014. The state noted that defendant had knowledge of the purported recantations more than five years ago, because "in June 2010, the defendant submitted to the Court a letter from the defendant's former attorney, dated December 1, 2009, which detailed the inquiry former counsel had conducted into the same claim defendant now presents, *i.e.*, that the victim and witnesses had recanted their testimony." (Memo Contra, 11.) The state thus asserted that defendant failed to act with reasonable diligence after discovering this evidence.

The record contains a December 1, 2009 letter from attorney Richard Cline. In the letter, Cline explains that, after he was appointed to represent defendant in his first appeal, defendant contacted Cline and asked if he would be "willing to assist [defendant] in preparing and filing a motion for new trial based on newly discovered evidence." (Cline Letter, 1.) Cline stated that the "basis for the motion was that the alleged victim and the two

witnesses * * * had recanted their trial testimony and were now willing to testify that [N.D.C.] did not commit the criminal acts with which he was charged." (Cline Letter, 1.) Cline stated that he "explained to [N.D.C.] that he would have to retain counsel" to file the motion for new trial, and that Cline would not work on the matter until his "retainer was paid." (Cline Letter, 1–2.) Defendant eventually paid Cline, and Cline was able to secure one meeting with the boys.

During that meeting, "the boys made statements to [Cline] that raised issues about whether they were truly recanting their trial testimony. The boys did state that their trial testimony was false, but were unable or unwilling to explain why they gave false testimony at trial." (Cline Letter, 2.) Cline felt that without an explanation, the boys' recantations would not support a motion for a new trial based on newly discovered evidence. Cline was never able to speak with the boys again, however, as their mother refused to make them available for a second interview. Cline noted that, "[a]t this point, it may be that the only affidavit that will be available to [N.D.C.] to support his motion will be my affidavit recounting the conversation I had with each of the boys." (Cline Letter, 3.) Defendant eventually fired Cline and sought a refund of the retainer fee.

The record also contains a May 9, 2010 handwritten letter from defendant to the trial court judge. In the letter, defendant notes that the judge may be unaware "of the most recent recantations involved with [the] case," and informs the judge that "all three kids went to my former lawyer Richard Cline and told him that they lied at trial." (Defendant's Letter to Judge Hogan, 1.) Defendant asked the judge if he could "subpoena the family to your chambers for a deposition," to show that the "kids were pressured into lieing [sic] in the first place." (Defendant's Letter to Judge Hogan, 2.)

The trial court denied defendant's motion for leave to file a delayed motion for new trial on December 30, 2014. The court reviewed the record, and observed that defendant "had knowledge of the purported recantations more than five years ago." (Decision, 3.) The court noted that, "[s]pecifically, four and one-half years ago, in June 2010, the defendant submitted to the Court a letter from the defendant's former attorney, dated December 1, 2009, which detailed the inquiry former counsel had conducted into the same claim defendant now presents." (Decision, 3.) The court also observed that "defendant's current counsel asserts that he was aware of the defendant's claim more than one year ago." (Decision, 3.) As such, the court concluded that, "[u]nquestionably, the

> defendant failed to act with reasonable diligence given his failure to present this information within a reasonable time after discovering it." (Decision, 4.)

*State v. N.D.C.*, No. 15AP-63, 2015 WL 5209424, at *3 (Ohio App. 10th Dist. Sept. 8, 2015). On September 8, 2015, the appellate court affirmed the trial court's denial of Petitioner's motion for leave to file a delayed motion for new trial. *Id.* On April 20, 2016, the Ohio Supreme Court declined to accept jurisdiction of the appeal. *State v. N.D.C.*, 145 Ohio St.3d 1446 (2016).

On March 29, 2017, Petitioner filed this action under 28 U.S.C. § 2254.[2] He asserts that he was denied the right to confront and cross-examine the witnesses against him in violation of his right to due process (claims one and two); that he was denied a fair trial because the *Indictment* failed to allege any culpable mental state (claim three); and that he is actually innocent of the charges in view of recantations by the alleged victim and child witnesses, and the trial court erred in denying his delayed motion for a new trial (claim four). On April 3, 2017, Petitioner amended the *Petition* to include affidavits from the alleged victim and witnesses. (Doc. 5, PageID# 42-47). Respondent contends that this action is barred by the one-year statute of limitations established by 28 U.S.C. § 2244(d) and, alternatively, that Petitioner's claims are procedurally defaulted or without merit.

## Motions for Production of Transcripts

Petitioner has filed two motions asking that Respondent be required to provide a free copy of transcripts from his trial, sentencing, and December 12, 2007, *Gardner* hearing. (Doc. 17, PageID# 1431). Respondent attached a copy of these trial transcripts to the *Return of Writ* (Doc. 15), and they are a part of the record before the Court. However, Respondent concedes that a copy of the transcripts was not served on Petitioner, taking the position that, in light of

---

[2] Petitioner originally filed the action in the Northern District of Ohio. The action was subsequently transferred to this Court. *Order* (Doc. 4).

10

Respondent's "procedural defenses of time-bar, non-cognizability and procedural default," Respondent was not required to provide a separate copy of the transcripts to Petitioner in these proceedings. *Respondent's Opposition to petitioner's Motion to Stay (Doc. 16) and Motion for Trial Transcripts (Doc. 17)* (Doc. 20, PageID# 1444-47). Petitioner represents that he did not previously obtain a copy of his transcripts from his former counsel, and he insists that he needs to review the transcripts in order to substantiate his gateway claim of actual innocence and to support the recanting affidavits of the alleged victim and witnesses. *Motion for Production of Trial Transcripts* (Doc. 21, PageID# 1448).

"It is well established that a state court must provide an indigent defendant a copy of his trial transcripts and court records so that the defendant may prosecute his direct appeal." *Kyle v. Gansheimer*, No. 5:11-cv-1395, 2011 WL 4566363, at *2 (N.D. Ohio Sept. 29, 2011) (denying request for free transcript where the petitioner did not allege that his attorney did not previously obtain a copy of the transcripts and he failed to show a "particularized need" for the transcripts on collateral review) (citing *Griffin v. Illinois*, 351 U.S. 12 (1956)). However, "[t]he Constitution does not require that an indigent defendant be provided a free transcript for use in attacking his conviction collaterally if a transcript was available on direct appeal." *Id*. (citing *United States v. MacCollom*, 426 U.S. 317, 325–326 (1976); *see also Jones v. Tibbals*, No. 5:13-cv-1171, 2014 WL 1806784, at *9 (N.D. Ohio May 7, 2014) ("Legally, it is well established that an appellant does not have an unqualified right to a transcript at the state's expense in a collateral matter.") (citing *MacCollom*, 424 U.S. at 317; *Rickard v. Burton*, 2 Fed.Appx. 469, 470 (6th Cir. 2001)). In order to obtain a free copy of the transcript, a habeas petitioner must show that the transcript is required in order to determine non-frivolous issues in his case. *See also* 28 U.S.C. §

753(f) (addressing the issue of free transcripts in collateral attacks under 28 U.S.C. § 2255 on federal convictions). Petitioner has failed to make that showing.

Although Petitioner represents that he "has never received a copy of any transcripts from former counsel," *Motion for Production of Trial Transcripts* (Doc. 21, PageID# 1448), Petitioner does not allege, and the record does not reflect, that his prior attorneys did not obtain a copy of the transcripts, or that Petitioner is unable to obtain – or has even attempted to obtain - a copy of those transcripts from his former counsel. Further, neither the state court's *Gardner* hearing, nor the transcript of Petitioner's sentencing hearing will assist him in establishing his actual innocence. Moreover, Petitioner has submitted the recanting affidavits in support of this claim. *See Motion to Amend Record/Petition Habeas Corpus* (Doc. 8, PageID# 55-60). Finally, the transcripts have been made a part of the record before this Court and are available for this Court's review.

Under all these circumstances, Petitioner's requests for a free copy of the transcripts (Docs. 17, 21) are **DENIED**.

## Motion for Stay

Petitioner also asks that these proceedings be stayed so that he might pursue a delayed application to reopen his appeal pursuant to Ohio Appellate Rule 26(B). *Motion for Stay of Proceedings* (Doc. 16). According to Petitioner, the *Indictment* contained multiple undifferentiated and duplicative charges and he seeks to raise in Rule 26(B) proceedings a claim that his convictions therefore violate the Double Jeopardy Clause. Presumably, Petitioner intends to thereafter further amend the *Petition* to include that issue.

Before a federal habeas court may grant relief, a state prisoner must exhaust his available remedies in the state courts. 28 U.S.C. § 2254(b)(1); *Castille v. Peoples*, 489 U.S. 346, 349

(1989); *Silverburg v. Evitts*, 993 F.2d 124, 126 (6th Cir. 1993). If a habeas petitioner has the right under state law to raise a claim by any available procedure, he has not exhausted that claim. 28 U.S.C. § 2254(b), (c). Moreover, a constitutional claim for relief must be presented to the state's highest court in order to satisfy the exhaustion requirement. *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999); *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990).

Furthermore, federal habeas courts may not entertain "mixed petitions," *i.e.*, petitions that present both exhausted and unexhausted claims. *Rose v. Lundy*, 455 U.S. 509 (1982). However, federal courts have the discretion to stay a mixed petition in order to permit a petitioner to present any unexhausted claim to the state courts, and then to return to federal court for review of all, now exhausted, claims. *Rhines v. Weber*, 544 U.S. 269 (2005). Stays under these circumstances should be only sparingly used; stays are not appropriate, for example, when the unexhausted grounds are plainly meritless. *Id*. at 278. But where the statute of limitations may bar a petitioner from re-filing his habeas corpus petition after exhausting state remedies, a federal habeas court may stay proceedings where the petitioner demonstrates "good cause" for failing to exhaust state remedies, his unexhausted claim is "potentially meritorious," and "there is no indication that the petitioner engaged in intentionally dilatory litigation tactics." *Id.* at 277-78.

It is significant that none of the claims that are currently before this Court is unexhausted.

> Some courts, including lower courts within the Sixth Circuit, have declined to extend the *Rhines* stay-and-abeyance procedure to petitions, such as this, containing only unexhausted claims. *See, e.g., Rasberry v. Garcia*, 448 F.3d 1150, 1154 (9th Cir. 2006); *Hust v. Costello*, 329 F. Supp. 2d 377, 380 (E.D. N.Y. 2004) (and cases cited therein); *Robinson v. Gidley*, No. 2:15cv10572, 2015 WL 1120118, at *2 (E.D. Mich. Mar.11, 2015) (and numerous cases cited therein); *Taylor v. Kelly*, No. 1:13cv2577, 2014 WL 4436595, at *1, *9 (N.D. Ohio Sept.9, 2014) (and numerous cases cited therein); *Secessions v. Warden, Lebanon Corr. Inst.*, No. 5:13cv195, 2014 WL 2919186, at *1, *5 (N.D. Ohio June 27, 2014); *Gatlin v. Clipper*, No. 5:13cv2434, 2014 WL 2743208, at

13

*2, *5 (N.D. Ohio June 17, 2014) (and cases cited therein); *Warren v. Warren*, No. 2:13cv11234, 2013 WL 1875948, at *2 (E.D. Mich. May 3, 2013); *Sidibeh v. Buchanan*, No. 2:12cv558, 2012 WL 6568231, at *8 (S.D. Ohio Dec.17, 2012) (King, M.J.) (*Report & Recommendation*), adopted, 2013 WL 80362 (S.D. Ohio Jan.27, 2013) (Graham, J.); *Mimms, supra*, 2009 WL 890509, at *3. *But cf. Doe v. Jones*, 762 F.3d 1174, 1176–81 (10th Cir. 2014) (holding that the district court had "discretion to consider a *Rhines* stay even though petitioner filed an unmixed petition" in a case where the petitioner had "little chance of exhausting [his] claims in state court and returning to federal court before the limitations period" expired), *cert. denied*, —U.S. — , 135 S.Ct. 1424, 191 L.Ed.2d 386 (2015); *Heleva v. Brooks*, 581 F.3d 187, 191–92 (3d Cir. 2009) (holding that the district court erred in ruling that "*Rhines* confines the availability of stay-and-abeyance solely to mixed petitions" given that in *Pace v. DiGuglielmo*, 544 U.S. 408, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005), which was decided one month after *Rhines*, the Supreme Court "sanctioned the use of stay-and-abeyance in a context outside that of mixed petitions" in a case involving the petitioner's "reasonable confusion about state filing requirements"); *Hyman v. Keller*, No. 106652, 2011 WL 3489092, at *10–11 (4th Cir. Aug. 10, 2011) (same); *Dolis v. Chambers*, 454 F.3d 721, 724–25 (7th Cir. 2006) (vacating the dismissal of a habeas petition containing only unexhausted claims and remanding with instructions to consider whether a stay was warranted in case where any future habeas petition would be time-barred). Courts that have held [that] a stay is inappropriate for petitions containing only unexhausted claims have reasoned that (1) the district court lacks jurisdiction over the petition while the petitioner pursues his claims in state court in the absence of "exhausted claims that could stay the petition;" and (2) "if district courts were to stay habeas petitions that were completely unexhausted in order to maintain their timeliness under the AEDPA, federal courts would be turned into a jurisdictional parking lot for unexhausted claims." *Hust*, 329 F. Supp. 2d at 380 (internal citation and quotation marks omitted); *Warren, supra,* 2013 WL 1875948, at *2; *see also United States v. Hickman,* 191 F. App'x 756, 757 (10th Cir. 2006) (denying certificate of appealability in a case where a petition containing only unexhausted claims was dismissed rather than stayed).

*Peterson v. Warden, Pickaway Corr. Inst.*, No. 1:14-cv-604, 2015 WL 3970171, at *7 (S.D. Ohio June 30, 2015) (declining to resolve the issue "because there appears to be a conflict among the circuit courts and it does not appear that the Sixth Circuit has weighed in on the issue[.]"); *see*

*also Gaitlin v. Clipper*, No. 5:13CV2434, 2014 WL 2743208, at *2 (N.D. Ohio June 17, 2014) (holding that stay and abeyance procedure does not apply where the petitioner does not present a mixed petition) (citing *Witherspoon v. Howes*, 1:07–CV–981, 2008 WL 3833751 *2 (W.D. Mich. Aug. 13, 2008); *Draheim v. Harry*, No. 1:05–cv–587, 2005 WL 2758089 at *3 (W.D. Mich. Oct.25, 2005)).

This Court need not resolve this issue because, in any event, the record does not reflect that a stay is warranted. As discussed *infra*, the statute of limitations governing Petitioner's current and (presumably) proposed claims has already expired. Moreover, Petitioner has failed to establish good cause for failing, to date, to pursue a delayed Rule 26(B) application. His proposed unexhausted claim would have been readily apparent from the face of the record years ago, and at the time of his trial. Petitioner has yet to pursue a delayed Rule 26(B) application. In view of these facts, the state appellate court would most certainly deny a delayed Rule 26(B) application at this time. This Court cannot, therefore, conclude that the proposed unexhausted claim is potentially meritorious, as that term is contemplated in *Rhines*. *See Childers v. Warden, Chillicothe Correctional Institution*, No. 2:13-cv-991, 2014 WL 3828429, at *4 (S.D. Ohio Aug. 4, 2014) (citing *Toledo v. Banks*, No. 09–cv–614, 2010 WL 2620593, at *5 (S.D.Ohio June 25, 2010) (citing *Williams v. Thaler*, 602 F.3d 291 (5th Cir. 2010); *Neville v. Dretke*, 423 F.3d 474, 480 (5th Cir. 2005); *Carter v. Friel*, 415 F.Supp.2d 1314, 1321–22 (D.Utah 2006); *Scott v. Sheldon*, 2009 2982866 (N.D.Ohio September 11, 2009); *Sieng v. Wolfe*, 2009 WL 1607769, *7, Case No. 2:08–cv–0044 (S.D.Ohio June 9, 2009); *Bailey v. Eberlin*, 2009 WL 1585006, *7, Case No. 2:08–cv–839 (S.D.Ohio June 4, 2009)). In short, a stay of proceedings to permit Petitioner to pursue a motion that has little, if any, likelihood of success is simply unwarranted.

Petitioner's *Motion for Stay of Proceedings* (Doc. 16) is therefore **DENIED**.

In sum, Petitioner's *Motion for Stay of Proceedings* (Doc. 16) is **DENIED** and Petitioner's *Motion(s) for Production of Trial Transcripts* (Docs. 17, 21) are likewise **DENIED**.

Petitioner may have 21 days from the date of this *Opinion and Order* to file his traverse to the *Return of Writ* (Doc. 14). *See Order* (Doc. 19).

                                      *s/ Norah McCann King*
                                      Norah McCann King
                                      United States Magistrate Judge

September 7, 2017