**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

NASSIR CAUTHON,

      Petitioner,

                                  **Case No. 2:17-cv-272**

      v.                           **JUDGE GEORGE C. SMITH**

                                  **Magistrate Judge King**

WARDEN, MARION
CORRECTIONAL INSTITUTION,

      Respondent.

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the *Petition*, as amended, Respondent's *Return of Writ*, Petitioner's *Traverse in Response to the Attorney General's Return of Writ*, and the exhibits of the parties.[1] For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED,** as barred by the one-year statute of limitations provided for in 28 U.S.C. § 2244(d)**.**

### Facts and Procedural History

Petitioner challenges his June 2006 convictions, following a jury trial in the Franklin county Court of Common Pleas, on charges of rape and gross sexual imposition. The Ohio Tenth District Court of Appeals summarized the facts and procedural history of the case as follows:

---

[1] Petitioner originally filed the action in the Northern District of Ohio. The action was subsequently transferred to this Court. *Order* (Doc. 4).

Defendant-appellant, N.D.C.,[2] appeals from the judgment of the Franklin County Court of Common Pleas reinstating the judgment of conviction following a remand from this court.

On June 17, 2005, appellant was indicted on four counts of rape, in violation of R.C. 2907.02, and one count of gross sexual imposition, in violation of R.C. 2907.05. A jury trial began on June 15, 2006. The jury returned verdicts finding appellant guilty of three counts of rape and one count of gross sexual imposition. Subsequent motions for acquittal and a new trial were denied by the trial court. By judgment entry filed July 3, 2006, the trial court imposed consecutive life sentences for the rape convictions and a five-year consecutive sentence for the gross sexual imposition conviction. Appellant timely appealed to this court and asserted a single assignment of error. *State v. N.D.C., Franklin App.* No. 06AP–790, 2007–Ohio–5088 ("N.D.C.I ").

The underlying facts of the convictions were set forth in N.D.C. I, as follows:

In April 2005, "DR," then age 12, resided with his mother (hereafter "DR's mother") and his two younger stepbrothers, "DC," age seven, and "NC," age eight, in Columbus, Ohio. Appellant is the father of DC and NC, and the stepfather of DR; appellant began dating DR's mother when DR was three years of age.

On April 1, 2005, appellant moved back to DR's mother's residence after being away for a period of time. The state's theory of the case was that appellant sexually assaulted DR on three separate occasions, over an approximate two-week period in early April 2005, while DR's mother was at work. DR testified that two of the incidents occurred when he was cleaning the bathroom; specifically, on both occasions, appellant entered the bathroom, pulled down DR's pants, and inserted his finger inside DR's anus. DR related a third incident in which appellant told him to go to his mother's bedroom, take off his clothes, and lie on the bed. DR testified that, as he was lying face down on the bed, appellant got on top of him and "put his penis inside my butt." (Tr. Vol. II, at 266.)

DR's younger brothers both testified regarding the alleged incident in the bedroom. Specifically, DR's brother, NC, testified that he observed his "dad on top of my brother" while looking through a vent located in his bedroom. (Tr. Vol. III, at 445.) DR's other

[2] Initials were used throughout the state appellate court's opinion "[f]or purposes of anonymity. . . ." *State of Ohio v. [N.D.C.]*, 2008 —Ohio— 6120, 2008 WL 5049761, *6 (Ohio App. 10th Dist. Nov. 25, 2008).

brother, DC, testified that he looked through his mother's bedroom door and observed his father on top of DR on the bed. According to DC, his father "[p]ut his private part in my brother's behind." (Tr. Vol. III, at 478.) Appellant noticed DC standing near the bedroom door, and he grabbed a belt and struck DC on the legs.

Sha Clark is a medical social worker at Children's Hospital. On May 23, 2005, Clark conducted an interview with DR at Children's Hospital. During the interview, DR indicated that, on several occasions, he had been a victim of sexual abuse by appellant. DR related that appellant had touched his private parts, and he described different incidents occurring in the bathroom and one incident that occurred in the bedroom.

Dr. Ellen McManus, an emergency medical physician at Children's Hospital, conducted a physical examination of DR on May 23, 2005. The physician noted nothing abnormal during the examination.

In April 2005, DR's mother was employed and worked first shift hours. Approximately two weeks after appellant had moved back to her residence, DR's mother noticed some marks on DC's legs. She asked NC about the marks on DC's legs, and NC told her appellant "had whooped him for getting in trouble at school." (Tr. Vol. III, at 528.) Appellant moved out of the house on April 15, 2005, and, on May 16, 2005, DR's mother learned of the alleged incident involving appellant and DR. She phoned the police, and subsequently took the boys to Children's Hospital.

On cross-examination, DR's mother acknowledged that she had concerns about appellant's sexuality, fearing he might do something sexually inappropriate to her children. When she asked DR whether any inappropriate activity had occurred, he repeatedly told her nothing had happened.

The first witness for the defense was an uncle of DR's (hereafter "DR's uncle"). In the spring of 2005, DR's uncle had a conversation with DR about alleged sexual contact, and DR denied having any such contact with appellant. DR's uncle testified that DR told him about threats his mother made to him (DR).

Kathleen Cooke is a private investigator who investigated the allegations at the request of defense counsel. As part of the investigation, Cooke interviewed DR's mother, who informed Cooke that she started a new job on April 7, 2005.

On May 17, 2005, Columbus Police Officer Wendell J. Tolber responded to a 911 call at an address on Maryland Avenue. According to Officer Tolber's report, the mother of an alleged victim (DR) told the officer that her husband had molested the victim, and that the "[v]ictim stated the incident occurred the end part of 2004." (Tr. Vol. IV, at 612.) A domestic violence detective was contacted and advised of the incident, but the detective indicated he would not be responding due to the span of time involved.

At trial, the parties entered into a stipulation that Franklin County Children Services caseworker Robin Glove, if called to testify, would state that she interviewed DR on May 6, 2005. During that interview, DR denied any touching or sexual contact by his stepfather. Further, DR did not make eye contact with the caseworker during the interview, and had his back to her while he was talking.

*Id*. at ¶ 3–13.

In *N.D.C. I*, appellant raised one assignment of error, which essentially alleged the trial court's interpretation of Ohio's rape shield law precluded him from offering a defense that there was an alternative explanation for the conduct alleged. Specifically, appellant argued the alleged victim, DR, was involved in several instances of digital anal sexual activity prior to the alleged conduct in the instant case. In support, appellant pointed to two 2003 reports from Children Services stating that "DR 'put his finger up DC's butt' " and that DR's cousin committed anal penetration against DR and another relative. *Id*. at ¶ 16.

After review, this court concluded the trial court's blanket exclusion of the evidence at issue, solely on the basis that such evidence did not fit within one of the exceptions under the rape shield statute, was error. This court held, based on *State v. Gardner* (1979), 59 Ohio St.2d 14, 391 N.E.2d 337, the trial court was required to balance the state's interest which the statute is designed to protect against the probative value of the excluded evidence, and that appellant was entitled to have the trial court assess whether the evidence was relevant to the theory presented, and, thus, constituted a material fact, and whether application of the rape shield statute was unconstitutional as applied to the facts. This court then stated:

> While we conclude that the trial court erred in not engaging in the requisite balancing under *Gardner*,

we decline to reverse for a new trial at this time. Rather, in light of the record on appeal, we remand this matter for the trial court to conduct a hearing and, in the first instance, engage in the appropriate balancing analysis to determine whether appellant's constitutional right to confrontation requires that evidence as to prior alleged sexual activity should have been admitted, even assuming it would otherwise be excluded by the rape shield statute. If, upon remand, the trial court determines that appellant's right to confrontation outweighs the state's interest in excluding this evidence, and that the probative value of the evidence at issue outweighs its prejudicial effect with respect to a material fact at issue, the trial court is instructed to vacate appellant's conviction and grant a new trial. Otherwise, the trial court shall reinstate the judgments of conviction. *See, e.g., State v. Boggs* (1992), 63 Ohio St.3d 418, 424, 588 N.E.2d 813 (following defendant's trial and conviction, matter remanded to trial court to conduct in camera hearing to determine, in first instance, whether evidence proffered by defense was properly excluded as involving activity protected by rape shield statute).

*Id*. at ¶ 36, 391 N.E.2d 337.

Upon remand from this court, the trial court conducted a hearing on December 21, 2007. Neither party offered new evidence, but both parties presented arguments based on relevant case law and the evidence admitted and/or offered at trial. After the hearing, the trial court rendered a decision on February 19, 2008, stating, in part:

> * * * The FCCS March 5, 2003, report would be relevant and probative if the allegations were substantiated. However, this incident was investigated and all involved denied the behavior. The probative value of this unsubstantiated report is nil. Most certainly there is no clear proof that the allegations in the March 5, 2003, FCCS report actually occurred. When weighted against the State's interest protected by the Rape Shield Law, the State's interest prevails.
>
> * * *

\* \* \* The FCCS March 17, 2003, report concerning DR's cousin committing anal penetration of DR is probative and relevant. \* \* \*

The evidentiary value of the FCCS report must be considered in light of the eyewitness testimony of these three children. \* \* \* When this diminished evidentiary value is compared to the State's interest protected by the Rape Shield Statute, the State's interest prevails.

\* \* \*

With all due respect to the appellate court, the child victim's testimony concerning the sexual conduct itself was not very detailed. This is common with child sexual assault victims. DR's testimony was, however, detailed concerning the events surrounding the assaults, *i.e.*, events leading up to and following, locations, witnesses to the bedroom assault and what happened to the witnesses after the fact. Having seen and heard the trial it is apparent to this Court that the "details" referenced in Clark's testimony and the prosecution argument were not sexual conduct detail but rather situational detail. When viewed in this light, the evidence of alleged prior sexual experiences of the child victim is much less important to the defendant's case. The defendant presented a vigorous defense. DR's mother, DR's uncle, and through stipulation, Robin Glove of FCCS all testified that DR denied any sexual contact by his stepfather. Dr. Ellen McManus noted nothing abnormal during the physical examination of DR. DR's mother admitted that DR's brother, NC, told her originally that appellant "had whooped him for getting in trouble at school." (Tr. Vol. III, at 528.) Defense counsel thoroughly cross examined DR's mother on matters of bias and prejudice toward the defendant and coaching of the child witnesses. It is simply untrue that the defendant was left defenseless without the evidence of DR's alleged prior sexual experience.

Accordingly, when this Court balances the State's interest which the Rape Shield Statute is designed to

> protect against the probative value of the excluded
> evidence, the State's interest prevails.

> The judgment of conviction is reinstated.

> It is from this judgment appellant appeals and brings the following
> two assignments of error for our review:

> First Assignment of Error:

> Mr. Cauthon was denied the right to confront and cross-examine
> witnesses, a fair trial, and due process of law, in violation of the
> fifth, sixth and fourteenth amendments to the U.S. Constitution and
> Article I, §§ 10 and 16 of the Ohio Constitution, when the court
> improperly limited cross-examination to preclude evidence of prior
> sexual misconduct by the victim relevant to support the defense
> theory of the case.

> Second assignment of Error:

> Mr. Cauthon was denied due process of law, in violation of the
> fifth, sixth and fourteenth amendments to the U.S. Constitution and
> Article I, §§ 10 and 16 of the Ohio Constitution, when the
> indictment failed to allege a culpable mental state.

*State v. N.D.C.*, No. 08AP-217, 2008 WL 5049761, at *1-4 (Ohio App. 10th Dist. Nov. 25,

2008).  On November 25, 2008, the appellate court affirmed the judgment of the trial court.  *Id.*

Petitioner did not timely appeal; however, on March 4, 2009, the Ohio Supreme Court granted

Petitioner's motion for a delayed appeal.  *State v. N.D.C.*, 121 Ohio St.3d 1406 (Ohio 2009).  On

July 1, 2009, the Ohio Supreme Court subsequently declined to accept jurisdiction of the appeal.

*State v. N.D.C.* 1454 (Ohio 2009).

> Petitioner pursued additional state collateral action.

> Defendant filed [a] motion for leave to file a delayed motion for
> new trial on December 5, 2014, asserting that he had recently
> discovered that the alleged victim stated "under oath, that he
> testified untruthfully at trial and the offenses of conviction did not
> occur." (Motion for Leave, 1.) Defendant asserted that, although
> D.R. admitted that he "came forward a couple of months after the
> trial and stated he was not sexually abused by [defendant]," no one

"did anything with [D.R.'s] recantation until it came to the attention of Defendant in the past 2 years." (Motion for Leave, 6.) Defendant noted that D.R., D.C., and N.C. first met with defendant's current counsel on August 2, 2013, and that the boys signed affidavits memorializing their recantations on November 21, 2014. Defendant accordingly asserted that the evidence "presented in these affidavits was not available at the time of trial and could not have been reasonably discovered through the exercise of due diligence," as "[o]ne can not force people to tell the truth." (Motion for Leave, 7.)

In their November 21, 2014 affidavits, D.R., D.C., and N.C. all stated that they had recanted their trial testimony shortly after the trial. D.R. averred that, "[w]ithin a couple of months after the trial" he "again told the truth that [he] was not sexually abused by [defendant]." (D.R. Affidavit, ¶ 10.) D.R. explained that, when he initially denied being sexually abused by defendant, his mother "whipped [him] with a belt and with her hands * * * she punched [him] in [his] face and she demanded that [he] tell the truth. This meant that [he] was coached by her to lie about [his] stepfather." (D.R. Affidavit, ¶ 6.) D.R. explained that he "felt a huge amount of pressure from [his] mom and [he] finally gave in and said what she wanted [him] to say." (D.R. Affidavit, ¶ 7.) D.R. stated that, for as long as he could remember, his mother had "falsely accused people of sex abuse." (D.R. Affidavit, ¶ 9.) D.R. averred that defendant was "in prison for something he did not do." (D.R. Affidavit, ¶ 11.) N.C. stated that he "told [his] mom 1 month after trial that [his] dad [was] innocent." (N.C. Affidavit, ¶ 9.) D.C. averred that "[f]or years [he][has] been telling others that [his] father never molested [his] brother." (D.C. Affidavit, ¶ 9.) N.C.'s and D.C.'s affidavits corroborated D.R.'s statements regarding their mother's influence on their testimonies.

The state filed a memorandum contra to the motion for leave on December 11, 2014. The state noted that defendant had knowledge of the purported recantations more than five years ago, because "in June 2010, the defendant submitted to the Court a letter from the defendant's former attorney, dated December 1, 2009, which detailed the inquiry former counsel had conducted into the same claim defendant now presents, *i.e.*, that the victim and witnesses had recanted their testimony." (Memo Contra, 11.) The state thus asserted that defendant failed to act with reasonable diligence after discovering this evidence.

The record contains a December 1, 2009 letter from attorney Richard Cline. In the letter, Cline explains that, after he was

appointed to represent defendant in his first appeal, defendant contacted Cline and asked if he would be "willing to assist [defendant] in preparing and filing a motion for new trial based on newly discovered evidence." (Cline Letter, 1.) Cline stated that the "basis for the motion was that the alleged victim and the two witnesses * * * had recanted their trial testimony and were now willing to testify that [N.D.C.] did not commit the criminal acts with which he was charged." (Cline Letter, 1.) Cline stated that he "explained to [N.D.C.] that he would have to retain counsel" to file the motion for new trial, and that Cline would not work on the matter until his "retainer was paid." (Cline Letter, 1–2.) Defendant eventually paid Cline, and Cline was able to secure one meeting with the boys.

During that meeting, "the boys made statements to [Cline] that raised issues about whether they were truly recanting their trial testimony. The boys did state that their trial testimony was false, but were unable or unwilling to explain why they gave false testimony at trial." (Cline Letter, 2.) Cline felt that without an explanation, the boys' recantations would not support a motion for a new trial based on newly discovered evidence. Cline was never able to speak with the boys again, however, as their mother refused to make them available for a second interview. Cline noted that, "[a]t this point, it may be that the only affidavit that will be available to [N.D.C.] to support his motion will be my affidavit recounting the conversation I had with each of the boys." (Cline Letter, 3.) Defendant eventually fired Cline and sought a refund of the retainer fee.

The record also contains a May 9, 2010 handwritten letter from defendant to the trial court judge. In the letter, defendant notes that the judge may be unaware "of the most recent recantations involved with [the] case," and informs the judge that "all three kids went to my former lawyer Richard Cline and told him that they lied at trial." (Defendant's Letter to Judge Hogan, 1.) Defendant asked the judge if he could "subpoena the family to your chambers for a deposition," to show that the "kids were pressured into lieing [sic] in the first place." (Defendant's Letter to Judge Hogan, 2.)

The trial court denied defendant's motion for leave to file a delayed motion for new trial on December 30, 2014. The court reviewed the record, and observed that defendant "had knowledge of the purported recantations more than five years ago." (Decision, 3.) The court noted that, "[s]pecifically, four and one-half years ago, in June 2010, the defendant submitted to the Court a letter from the defendant's former attorney, dated December 1, 2009, which

detailed the inquiry former counsel had conducted into the same claim defendant now presents." (Decision, 3.) The court also observed that "defendant's current counsel asserts that he was aware of the defendant's claim more than one year ago." (Decision, 3.) As such, the court concluded that, "[u]nquestionably, the defendant failed to act with reasonable diligence given his failure to present this information within a reasonable time after discovering it." (Decision, 4.)

*State v. N.D.C.*, No. 15AP-63, 2015 WL 5209424, at *3 (Ohio App. 10th Dist. Sept. 8, 2015).

On September 8, 2015, the appellate court affirmed the trial court's denial of Petitioner's motion for leave to file a delayed motion for new trial. *Id.* On April 20, 2016, the Ohio Supreme Court declined to accept jurisdiction of the appeal. *State v. N.D.C.*, 145 Ohio St.3d 1446 (Ohio 2016).

On March 29, 2017, Petitioner filed this action under 28 U.S.C. § 2254. He asserts that he was denied the right to confront and cross-examine the witnesses against him, in violation of due process (claims one and two); that he was denied a fair trial because the *Indictment* failed to allege any culpable mental state (claim three); and that he is actually innocent of the charges in view of recantations by the alleged victim and child witnesses, and the trial court erred in denying his delayed motion for a new trial (claim four). On April 3, 2017, Petitioner amended the *Petition* to include affidavits from the alleged victim and witnesses. (Doc. 5, PageID# 42-47.) Respondent contends that this action is barred by the one-year statute of limitations established by under 28 U.S.C. § 2244(d) and, alternatively, that Petitioner's claims are procedurally defaulted or without merit.

**Statute of Limitations**

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which became effective on April 24, 1996, imposes a one-year statute of limitations on the filing of habeas corpus petitions:

(1) A 1–year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of –

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State postconviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d). Applying the language of § 2244(d)(1)(A), Petitioner's conviction became final on September 29, 2009, *i.e.,* ninety days after the Ohio Supreme Court's July 1, 2009, dismissal of the appeal, when the time for filing a petition for a writ of *certiorari* expired. *See Lawrence v. Florida,* 549 U.S. 327, 333 (2007); *Smith v. Ohio Department of Rehabilitation and Correction*, 331 F.Supp.2d 605, 613 (N.D. Ohio 2004) (citing *Bell v. Maryland*, 378 U.S. 226, 232 (1964); *Bronaugh v. Ohio,* 235 F.3d 280, 283 (6th Cir. 2000)); *Lee v. Warden*, No. 2:08-cv-415, 2009 WL 1911917, at *1 (S.D. Ohio June 30, 2009) (citing *Clay v. United States*, 537 U.S. 522, 527-28 (2003)).  The statute of limitations began to run the following day and expired one year later, on September 30, 2010.  Yet Petitioner waited more than six years and five months

after that date to execute the *Petition.  See Petition* (Doc. 1, PageID# 16)(Indicating that the *Petition* was signed on March 20, 2017). Petitioner's December 5, 2014, motion for leave to file a delayed motion for new trial did not toll the running of the statute of limitations, because the statute of limitations had already long since expired prior to the filing of that motion.  *See Vroman v. Brigano*, 346 F.3d 598, 602 (6th Cir. 2003)("The tolling provision does not. . . 'revive' the limitations period (*i.e.,* restart the clock at zero); it can only serve to pause a clock that has not yet fully run. Once the limitations period is expired, collateral petitions can no longer serve to avoid a statute of limitations.").

Petitioner asserts that he is actually innocent in view of the affidavits of the alleged victim and witnesses recanting their trial testimony.  Therefore, he contends, this action is timely under 28 U.S.C. § 2244(d)(1)(D).  Referring to a letter that he submitted to the state court in support of his motion for a new trial, Petitioner also contends that he has acted diligently in pursuing relief.  *Traverse* (Doc. 33, PageID# 1594).  The letter, dated December 1, 2009, was written by Attorney Richard Cline to the Columbus Bar Association, and indicates that Petitioner contacted Cline, who had represented Petitioner on direct appeal, to request assistance in the filing of a motion for a new trial based on the children's recantations.  *See Letter from Richard A. Cline to Columbus Bar Association*, attached to *Brief for Appellant*, Exhibit 31 to *State Court Record* (Doc. 13). As noted by the state appellate court, Cline had met with the three boys at his office and obtained statements from them indicating that they had testified falsely against Petitioner at trial; however, Attorney Cline did not feel that he had a sufficient basis for filing a motion for a new trial, because the children offered no explanation for their allegedly false testimony and "refused to adopt the position urged by Mr. Cauthon (that their mother pressured them to make false accusations against him)."  *Id.* (Doc. 13, PageID# 467).  Petitioner indicates

that he learned that the alleged victim and witness had recanted their trial testimony in April 2009, but insists that he could not obtain affidavits from them until they were no longer minors and under the influence of their mother. Petitioner further claims that Attorney Cline performed in a constitutionally ineffective manner, and thereby prevented Petitioner from timely filing. *Traverse* (Doc. 33, PageID# 1595-96). These arguments are not persuasive.

Under the provision of 28 U.S.C. § 2244(d)(1)(D), a petitioner must file his habeas corpus petition within one year from the date that his claim "could have been discovered through the exercise of due diligence." The question is not when the petitioner first learns of the factual predicate for his claim but, rather, when the petitioner should have learned of the basis for his claim had he exercised reasonable care. *Townsend v. Lafler,* 99 F. App'x 606, 608 (6th Cir. 2004) (citations omitted). "Section 2244(d)(1)(D). . . does not convey a statutory right to an extended delay while a habeas petitioner gathers evidence that might support a claim." *Brooks v. McKee*, 307 F. Supp. 2d 902, 906 (E.D. Mich. 2004) (citation omitted). It is the petitioner's burden to establish that he exercised due diligence in searching for the factual predicate for his habeas corpus claim. *Redmond v. Jackson*, 295 F.Supp.2d 767, 772 (E.D. Mich. 2008)(citing *Stokes v. Leonard*, 36 F. App'x 801, 804 (6th Cir. 2002)). Petitioner has failed to carry this burden.

The record establishes that Petitioner learned that the alleged victim and the other minor witnesses had recanted their trial testimony years before Petitioner pursued a delayed motion for a new trial. *See State v. N.D.C.*, 2015 WL 5209424, at *6. The alleged victim was 21 years old at the time he signed his affidavit recanting his trial testimony in November 2014. *See Affidavit* (Doc.5, PageID# 42)(Doc. 13, PageID# 461). In affirming the trial court's denial of that motion for a new trial, the state appellate court observed that Petitioner had "failed to offer a sufficient

explanation for his five-year delay in filing the motion" and "[n]otably, [] did not file an affidavit or any other evidence explaining what occurred between 2009 and 2014 to prevent him from filing the motion for leave based on the recantations." *State v. N.D.C.*, 2015 WL 5209424, at *6.

Defendant filed the instant motion for leave to file a delayed motion for new trial on December 5, 2014, asserting that he had recently discovered that the alleged victim stated "under oath, that he testified untruthfully at trial and the offenses of conviction did not occur." (Motion for Leave, 1.) Defendant asserted that, although D.R. admitted that he "came forward a couple of months after the trial and stated he was not sexually abused by [defendant]," no one "did anything with [D.R.'s] recantation until it came to the attention of Defendant in the past 2 years." (Motion for Leave, 6.) Defendant noted that D.R., D.C., and N.C. first met with defendant's current counsel on August 2, 2013, and that the boys signed affidavits memorializing their recantations on November 21, 2014. Defendant accordingly asserted that the evidence "presented in these affidavits was not available at the time of trial and could not have been reasonably discovered through the exercise of due diligence," as "[o]ne can not force people to tell the truth." (Motion for Leave, 7.)

In their November 21, 2014 affidavits, D.R., D.C., and N.C. all stated that they had recanted their trial testimony shortly after the trial. D.R. averred that, "[w]ithin a couple of months after the trial" he "again told the truth that [he] was not sexually abused by [defendant]." (D.R. Affidavit, ¶ 10.) D.R. explained that, when he initially denied being sexually abused by defendant, his mother "whipped [him] with a belt and with her hands * * * she punched [him] in [his] face and she demanded that [he] tell the truth. This meant that [he] was coached by her to lie about [his] stepfather." (D.R. Affidavit, ¶ 6.) D.R. explained that he "felt a huge amount of pressure from [his] mom and [he] finally gave in and said what she wanted [him] to say." (D.R. Affidavit, ¶ 7.) D.R. stated that, for as long as he could remember, his mother had "falsely accused people of sex abuse." (D.R. Affidavit, ¶ 9.) D.R. averred that defendant was "in prison for something he did not do." (D.R. Affidavit, ¶ 11.) N.C. stated that he "told [his] mom 1 month after trial that [his] dad [was] innocent." (N.C. Affidavit, ¶ 9.) D.C. averred that "[f]or years [he][has] been telling others that [his] father never molested [his] brother." (D.C. Affidavit, ¶ 9.) N.C.'s and D.C.'s affidavits corroborated D.R.'s statements regarding their mother's influence on their testimonies.

The state filed a memorandum contra to the motion for leave on December 11, 2014. The state noted that defendant had knowledge of the purported recantations more than five years ago, because "in June 2010, the defendant submitted to the Court a letter from the defendant's former attorney, dated December 1, 2009, which detailed the inquiry former counsel had conducted into the same claim defendant now presents, i.e., that the victim and witnesses had recanted their testimony." (Memo Contra, 11.) The state thus asserted that defendant failed to act with reasonable diligence after discovering this evidence.

The record contains a December 1, 2009 letter from attorney Richard Cline. In the letter, Cline explains that, after he was appointed to represent defendant in his first appeal, defendant contacted Cline and asked if he would be "willing to assist [defendant] in preparing and filing a motion for new trial based on newly discovered evidence." (Cline Letter, 1.) Cline stated that the "basis for the motion was that the alleged victim and the two witnesses * * * had recanted their trial testimony and were now willing to testify that [N.D.C.] did not commit the criminal acts with which he was charged." (Cline Letter, 1.) Cline stated that he "explained to [N.D.C.] that he would have to retain counsel" to file the motion for new trial, and that Cline would not work on the matter until his "retainer was paid." (Cline Letter, 1–2.) Defendant eventually paid Cline, and Cline was able to secure one meeting with the boys.

During that meeting, "the boys made statements to [Cline] that raised issues about whether they were truly recanting their trial testimony. The boys did state that their trial testimony was false, but were unable or unwilling to explain why they gave false testimony at trial." (Cline Letter, 2.) Cline felt that without an explanation, the boys' recantations would not support a motion for a new trial based on newly discovered evidence. Cline was never able to speak with the boys again, however, as their mother refused to make them available for a second interview. Cline noted that, "[a]t this point, it may be that the only affidavit that will be available to [N.D.C.] to support his motion will be my affidavit recounting the conversation I had with each of the boys." (Cline Letter, 3.) Defendant eventually fired Cline and sought a refund of the retainer fee.

The record also contains a May 9, 2010 handwritten letter from defendant to the trial court judge. In the letter, defendant notes that the judge may be unaware "of the most recent recantations involved with [the] case," and informs the judge that "all three kids

went to my former lawyer Richard Cline and told him that they lied at trial." (Defendant's Letter to Judge Hogan, 1.) Defendant asked the judge if he could "subpoena the family to your chambers for a deposition," to show that the "kids were pressured into lieing [sic] in the first place." (Defendant's Letter to Judge Hogan, 2.)

The trial court denied defendant's motion for leave to file a delayed motion for new trial on December 30, 2014. The court reviewed the record, and observed that defendant "had knowledge of the purported recantations more than five years ago." (Decision, 3.) The court noted that, "[s]pecifically, four and one-half years ago, in June 2010, the defendant submitted to the Court a letter from the defendant's former attorney, dated December 1, 2009, which detailed the inquiry former counsel had conducted into the same claim defendant now presents." (Decision, 3.) The court also observed that "defendant's current counsel asserts that he was aware of the defendant's claim more than one year ago." (Decision, 3.) As such, the court concluded that, "[u]nquestionably, the defendant failed to act with reasonable diligence given his failure to present this information within a reasonable time after discovering it." (Decision, 4.)

*Id.* at *4-5.

The record demonstrates that defendant was aware of the recantations at least by 2009, when he retained Cline to file a motion for new trial based on the recantations. However, defendant failed to file his motion for leave to file a delayed motion for new trial until December 2014, a five-year delay. . . . [T]he five-year delay in filing the motion for leave was unreasonable. As noted above, defendant did not provide the court with an affidavit or any other evidence to justify this lengthy delay.

*Id.* at *8. *See also Chamblin v. Warden, Chillicothe Correctional Institution*, 2016 WL 8679076, at *7 (S.D. Ohio June 24, 2016) (letters from petitioner's children recanting their trial testimony was either known or discoverable in the exercise of due diligence at the time of trial). This Court agrees that Petitioner filed to exercise due diligence in pursuing his claims and concludes that this action is untimely, even as measured under the standard of 28 U.S.C. § 2244(d)(1)(D).

The Court also concludes that the running of the statute of limitations should not be equitably tolled. *See Holland v. Florida*, 560 U.S. 631, 650 (2010) (A petitioner is entitled to

equitable tolling only if he shows "1) that he has been pursuing his rights diligently, and 2) that some extraordinary circumstances stood in his way" and prevented timely filing). Moreover, this Court is not persuaded that the record reflects that Petitioner can establish a credible claim of actual innocence sufficient to justify the equitable tolling of the statute of limitations. *See Souter v. James*, 395 F.3d 577, 602 (6th Cir. 2005).

"[T]he Sixth Circuit has recognized an 'actual innocence' exception to the one-year statute of limitations." *Maag v. Konteh*, No. 3:05-cv-1574, 2006 WL 2457820, at *1 (N.D. Ohio Aug. 23, 2006) (citing *Souter,* 395 F.3d at 577). Accordingly, "a petitioner whose claim is otherwise time-barred may have the claim heard on the merits if he can demonstrate through new, reliable evidence not available at trial, that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt." *Yates v. Kelly*, No. 1:11-cv-1271, 2012 WL 487991. at *1 (N.D. Ohio Feb. 14, 2012) (citing *Souter,* 395 F.3d at 590). Actual innocence means factual innocence, not mere legal insufficiency. *See Bousely v. United States*, 523 U.S. 614, 623 (1998). However, a petitioner must overcome a high hurdle in order to establish his actual innocence.

> The United States Supreme Court has held that if a habeas petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims." *Schlup* [*v. Delo*], 513 U.S. [298,] 316 [(1995)]. Thus, the threshold inquiry is whether "new facts raise[ ] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial." *Id*. at 317, 513 U.S. 298, 115 S. Ct. 851, 130 L.Ed.2d 808 .... "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324, 115 S. Ct. 851, 130 L.Ed.2d 808. The Court counseled however, that the actual innocence exception

> should "remain rare" and "only be applied in the 'extraordinary
> case.' " *Id*. at 321, 513 U.S. 298, 115 S. Ct. 851, 130 L.Ed.2d 808.

*Souter*, at 589-90 (footnote omitted). A petitioner who asserts a convincing claim of actual

innocence need not establish that he was diligent in pursuing this claim. *McQuiggin v. Perkins*,

569 U.S. 383, 133 S. Ct. 1924, 1932-33 (2013). Unexplained delay, however, still undermines

such a petitioner's credibility. The Supreme Court has emphasized that "[t]o invoke the

miscarriage of justice exception to AEDPA's statute of limitations, we repeat, a petitioner 'must

show that it is more likely than not that no reasonable juror would have convicted him in the

light of the new evidence.'" *Id*. at 1935 (quoting *Schlup*, 513 U.S. at 332, 327). This Court is

not persuaded that Petitioner can meet this burden here.

As discussed, Petitioner has submitted affidavits – dated November 2014 – from the

alleged victim and a witness, his child and step son, recanting their trial testimony in support of

his claim that he is actually innocent of the charges against him. The victim, who was twenty-

one when he signed his affidavit, indicates that his mother whipped him with a belt and her

hands, and punched him in the face and demanded that he tell the truth – which meant that he

should lie about being sexually abused by Petitioner. This affiant states that he told people at the

hospital that he had been sexually abused by his father. He indicates, however, that he lied and

that Petitioner never abused him in any way. He "felt a huge amount of pressure" from his

mother and "finally gave in and said what she wanted [him] to say." *Affidavit* (Doc. 5, PageID#

42)(Doc. 13, PageID# 461). He further states that, as long as he can remember, his mother

falsely accused people of sexual abuse and she threatened him and his brothers to "come clean

about it." *Id*.

> Within a couple of months after the trial I again told the truth that I
> was not sexually abused by Nassir;

> My stepdad is a victim and is in prison for something he did not
> do;
>
> I have not been threatened or promised any reward for this
> information.

*Id*. (Doc. 5. PageID# 43)(Doc. 13, PageID# 462).

One of the other affiants states in his affidavit that his testimony – *i.e*., that his father had beat him because he caught him witnessing a sexual attack against his brother – "was entirely false." *Affidavit* (Doc. 5, PageID# 44)(Doc. 13, PageID# 463).

> I never saw my father commit any of these acts;
>
> The reason I lied is I was deathly afraid of my mother who would
> whip me over and over again to get me to state my father did
> something he did not do[.]

*Id*. This affiant also indicates that his mother questioned him "for years" regarding whether he had been sexually abused, whipped him, and accused him and his brothers of lying about sexual abuse.

> I was actually spanked with a belt by my dad but that was because
> I got caught stealing pencils and suspended from school. . . .
>
> For years I have been telling others that my father never molested
> my brother or anyone else that I know about[.]

*Id.*

The final affiant, Petitioner's son who was seventeen years old at the time that he signed his affidavit, also indicates that he lied when he testified at trial that he had witnessed his father on top of his brother as he looked through a vent into his bedroom. *Affidavit* (Doc. 5, PageID# 46)(Doc. 13, PageID# 459). This affiant states that he lied because he was afraid of his mother, who constantly accused his father and other relatives of sexually abusing him and his brothers. *Id*. He always denied any kind of abuse until he "couldn't take the whippings anymore." *Id*.

"She hit me with belts and sticks, extension cords, until me and my little brother made up a story to keep from getting beaten[.]" *Id.* He told his mother one month after the trial that his father is innocent. "I never knew what would become of my father but I just wanted the whippings to stop and they stopped[.]" *Id.* "I have not been threatened or promised any reward for this information[.]" *Id.*

Of course, these affidavits directly contradict the sworn testimony of these same witnesses at trial. The defense argued that the mother had pressured and threatened her children into making false allegations against Petitioner. As noted by the state appellate court, defense counsel cross-examined these witnesses and the alleged victim regarding their prior inconsistent statements. *See Trial Transcript, Vol. II* (Doc. 15-2, PageID# 870-71); *Trial Transcript, Vol. IV* (Doc. 15-4, PageID# 1231). The victim had told his aunt that he had lied; he told his uncle that Petitioner should not be in jail because he did not do anything. *Trial Transcript, Vol. II* (Doc. 15-2, PageID# 870). He had lied about several alleged sexual assaults that had taken place and denied, when speaking to Children Services, that anything had happened. *Id.* (PageID# 924-25; 928); *Trial Transcript*, *Vol. IV* (Doc. 15-4, PageID# 1229).

> Recantation testimony, particularly when it is belatedly submitted, is considered "of little value" and "viewed with great suspicion." *See Carter v. Mitchell*, 443 F.3d 517, 539 (6th Cir. 2006) (and cases cited therein). *See also Herrera v. Collins*, 506 U.S. 390, 423 (1993) (O'Connor, J., concurring)) (holding that the petitioner had failed to demonstrate a credible claim of actual innocence "under the demanding *Schlup* standard" given that "recanting affidavits are always viewed with 'extreme suspicion'" and "new statements from witnesses years after the crime are inherently suspect" and "are to be viewed with a 'degree of skepticism'"); *Byrd v. Collins*, 209 F.3d 486, 508 n. 16 (6th Cir. 2000)(" 'Recanting affidavits and witnesses are viewed with extreme suspicion by the courts.'") (quoting *Spence v. Johnson*, 80 F.3d 989, 997 (5th Cir. 1996)); *Gray v. Hudson*, 2008 WL 1995362, at *7 (N.D. Ohio May 5, 2008) (Boyko, J.)(stating that "the inherent suspiciousness of the recanting affidavits [of prosecution witnesses] coupled with their

> late filing more than three years after conviction and the lack of explanation as to why they were filed so late" failed to demonstrate "new reliable evidence" of the petitioner's actual innocence); *Cleveland,* 65 F.Supp.3d at 523 ("[A] recantation must be looked upon with the utmost suspicion")(quoting *Ortega v. Duncan*, 333 F.3d 102, 107 (2nd Cir. 2003)). This is particularly so where a "recantation is repudiated and a new one substituted." *Campbell v. Curtis,* 2008 WL 4104346 at *6 (E.D. Mich. Aug. 29, 2008) (quoting *U.S. v. Brown*, 417 F.Supp. 340, 343 (E.D. Pa. 1976)).

*Davis v. Bradshaw*, No. 1:14-cv-2854, 2016 WL 8257676, at *29 (N.D. Ohio June 16, 2016).

"'Skepticism about recantations is especially applicable in cases of child sexual abuse, where recantation is a recurring phenomenon, such as where family members are involved and the child has feelings of guilt or where family members seek to influence the child to change the story.'"

*Wiles v. Warden, Marion Correctional Institution*, No. 1:14-cv-685, 2015 WL 4467766, at *7 (S.D. Ohio July 21, 2015) (quoting *Parker v. Bauman*, No. 5:10cv14304, 2012 WL 2223986, at *7–8 (E.D. Mich. June 15, 2012) (citing *United States v. Miner*, 131 F.3d 1271, 1273–74 (8th Cir.1997); *United States v. Provost*, 969 F.2d 617, 619–20 (8th Cir. 1992)) (rejecting actual-innocence claim in a case involving a handwritten letter to the petitioner that was purportedly written by the victim nearly two years after she had initially made the sexual assault allegations against the petitioner); *Artiaga v. Money*, No. 3:04cv7121, 2006 WL 1966612, at *11–13 (N.D. Ohio July 11, 2006) (and numerous authorities cited therein) (holding that child sex abuse victim's recantation of her original testimony against her father was "not new reliable evidence to support a claim of actual innocence"). "Assuming that the victims' belated recantation of their trial testimony can be classified as 'new,' such testimony falls 'far short of the sort of extraordinary showing – like exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – needed to establish [the petitioner's] actual innocence.'" *Chamblin*, 2016 WL 8679076, at *11 (citing *Freeman v. Trombley*, 483 Fed.Appx. 51, 60 (6th

Cir. 2012)(finding that the credibility of the petitioner's ex-girlfriend and mother of his child was "suspect" and holding that her alibi affidavit submitted years after the petitioner's trial was insufficient to establish a credible actual-innocence claim)).

Based upon this record, and because this type of recantation testimony is regarded with "extreme suspicion," the Court is not persuaded that the affidavits, submitted years after trial, sufficiently establish that no reasonable juror would have found Petitioner guilty beyond a reasonable doubt of rape and gross sexual imposition. *See McQuiggin*, 133 S.Ct. at 1928; *Schlup*, 513 U.S. at 329; *see also Mahaffey v. Scutt*, No. 12-cv-13743, 2014 WL 4206947, at *6 n.2 (E.D. Mich. Aug. 25, 2014) (victim's alleged recantation does not amount to the type of reliable evidence that would establish a petitioner's actual innocence sufficient to excuse a procedural default) (citing *Carter v. Mitchell*, 443 F.3d 517, 539 (6th Cir. 2006)); *Cramer v. Duffey*, No. 2:11-cv-504, 2012 WL 368053, at *7 (S.D. Ohio Feb. 3, 2012) (submission of recanting affidavits from the alleged victims does not constitute evidence of actual innocence justifying an evidentiary hearing on issue of equitable tolling of statute of limitations) (citations omitted)).

## Recommended Disposition

Therefore, the Magistrate Judge **RECOMMENDS** that that this action be **DISMISSED** as barred by the one-year statute of limitations established by in 28 U.S.C. § 2244(d)**.**

## Procedure on Objections

If any party objects to this *Report and Recommendation*, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those

portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. 636(B)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.


                                       *s/ Norah McCann King*
                                       Norah McCann King
                                       United States Magistrate Judge

November 28, 2017